IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PHOENIX BRANDS LLC, *et al.*,[1] | ) | Case No. 16-11242 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |

## DECLARATION OF WILLIAM LITTLEFIELD
## IN SUPPORT OF FIRST DAY PLEADINGS

William Littlefield duly affirms the following under penalty of perjury:

1.    I am (i) the Chief Executive Officer and President of Phoenix Brands LLC ("Phoenix Brands"), a Delaware limited liability company, and (ii) a manager on the board of managers of Phoenix Brands Parent LLC ("Phoenix Parent"), a Delaware limited liability company and the ultimate parent company for Phoenix Brands and its 3 affiliated debtors and debtors in possession (collectively, the "Debtors") that have filed voluntary petitions (the "Chapter 11 Petitions") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing these chapter 11 cases (the "Cases").

2.    I am authorized to submit this declaration (this "Declaration") on behalf of the Debtors. This Declaration is made pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") in support of the Chapter 11 Petitions and each of the motions and applications for relief filed concurrently herewith (collectively, the "First Day Pleadings"). I have reviewed the First Day Pleadings or have otherwise had their contents

---

[1]  The Debtors, together with the last four digits of each Debtor's tax identification number, are: Phoenix Brands LLC, (4609), Phoenix Brands Parent LLC, (8729), Phoenix North LLC, (no EIN), and Phoenix Brands Canada ULC (a Nova Scotia Company). The address of each of the Debtors is 1 Landmark Square, Suite 1810, Stamford, CT 06901, except Phoenix Brands Canada ULC, which is Box 50, 1 First Canadian Place, Toronto, Ontario, Canada M5X 1B8.

explained to me and believe that approval of the First Day Pleadings is necessary to minimize the adverse effects of filing for chapter 11 protection while at the same time maximizing value for the benefit of stakeholders. To the best of my knowledge, after reasonable inquiry, I believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption; (b) is critical to the Debtors' efforts to preserve value and maximize recoveries; and (c) best serves the Debtors' estates and creditors' interests. Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of these Cases.

3.     Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals that I believe in good faith to be reliable; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would testify to the facts set forth in this Declaration.

4.     In 2012, I became the president and CEO of Phoenix Brands. In performing my role as Chief Executive Officer, I have become familiar with the Debtors' history, day-to-day operations, business and financial affairs, and books and records, as well as the Debtors' turnaround and restructuring efforts. In October 2015, Phoenix Brands retained Peter A. Furman as the Chief Restructuring Officer (the "CRO"). The CRO and I will be overseeing and advising the Debtors on their day-to-day operations, bankruptcy compliance, budgets, cash flows, asset dispositions, and overall restructuring and reorganizing efforts.

5.     From 2008 through 2011, I served as Executive Vice President and General Manager of the Sun Products Company. From 1980 through 2008, I served in many roles,

including as a Senior Vice President and General Manager of Unilever. I have considerable experience in operating and managing consumer products companies, including managing companies in turnaround and distressed environments.

6.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. It is anticipated that the Debtors will continue to manage their affairs and operate their businesses as debtors and debtors-in-possession pursuant and subject to the requirements of sections 1107(a) and 1108 of the Bankruptcy Code.

7.    Part I of this Declaration provides an overview of the Debtors' corporate structure, businesses, and prepetition indebtedness. Part II describes the circumstances surrounding the commencement of these Cases. Part III sets forth relevant facts in support of certain key motions and the First Day Pleadings.

**THE DEBTORS' BUSINESSES**

8.    The Debtors source, manufacture, and distribute laundry and fabric care products primarily in North America, with regional and national recognition and distribution. The Debtors were formed in 2003 by a number of ex-Unilever employees as "Winter Brands." The initial focus of Winter Brands was the fabrication of licensed consumer properties.

9.    In 2004, Winter Brands was renamed "Phoenix Brands." Subsequently, on or about January 5, 2004, Phoenix Brands acquired certain assets from Conopco, Inc., an affiliate of Unilever. The acquired assets included inventory, real property and leasehold improvements, equipment, trademarks, and recipes for the Rit dye ("Rit"), Niagara spray starch ("Niagara")[2],

---

[2] The Debtors marketed and sold the Niagara brand in 2015.

Sunlight dish detergent ("Sunlight"),[3] Sun Guard wash-in powder, and Final Touch fabric softener ("Final Touch") brands. On August 24, 2005, Phoenix Brands acquired from Colgate-Palmolive Company assets including inventory, molds, trademarks, and recipes for the Fab, Dynamo, Ajax Laundry Detergent ("Ajax"), Fresh Start, Cold Power, Arctic Power, and ABC brands of laundry detergent. The Debtors also acquired the license to use the name "Ajax" for the sale of laundry products.

10.    Phoenix Brands is headquartered at 1 Landmark Square, Suite 1810, Stamford, CT 06901, and operates out of multiple other locations including a finance/operations office and a factory facility in Indianapolis, Indiana, and in Toronto, Ontario, Canada. Phoenix Brands operates under leases and office license agreements, and does not own, any of these premises. Each lease or license is in the name of Phoenix Brands.

11.    As of the Petition Date, the Debtors have approximately forty-four full-time employees and five independent contractors, with almost all of them employed by Phoenix Brands. Phoenix Brands Canada ULC employs one employee, who works from a home office located in or around Toronto, Canada.

12.    For the twelve months ending December 31, 2015, Phoenix Brands generated approximately $71,684,000 in net revenues on a consolidated basis (including the net revenues from the Niagara Brand for 10 months). As of December 31, 2015, Phoenix Brands had assets per balance sheet with a book value of approximately $45,155,000 and liabilities of $71,387,000 on a consolidated basis.

---

[3] The Debtors acquired a license to use the Sunlight brand name. The Debtors marketed and sold the Sunlight brand in 2010.

4

B.    Corporate Structure

13.    Phoenix Brands Parent LLC is the ultimate parent company for the Debtors. A chart depicting the corporate organizational structure of the Company is attached hereto as Exhibit A.

14.    Phoenix Brands' Parent's three classes of equity are held by approximately 25 holders. The following is a general description of the three equity classes:

(a)    Class A Units: Phoenix Brands Parent currently has 60,202,128.54 Class A Units outstanding. The Class A Units are held, directly or indirectly, by Lincolnshire Equity Fund IV, L.P., Lincolnshire Equity Fund IV-A, L.P. (collectively "LEF4"), certain former managers, and Madison Capital Funding LLC ("Madison"). The Class A units have voting rights on a 1 vote per unit basis.

(b)    Class B Units: Phoenix Parent currently has 7,988 Class B Units outstanding and 100 Class B Units pending. The Class B Units do not have any voting rights, and are held by members of the Debtors' management team, as well as by current and past members of the Board of Managers and certain consultants to the Debtors. The Class B Units are profits interests and only have value to the extent Phoenix Parent's valuation per unit exceeds the applicable threshold amount.

(c)    Class C Units: Phoenix Brands Parent currently has 7,500,000 Class C Units outstanding. The Class C Units are held, directly or indirectly, by LEF4. The Class C units have voting rights on a 1 vote per unit basis. These units are not subject to a mandatory distribution, but have a distribution preference on liquidation of the Debtors.

DOCS_DE:207335.1 70787/001

C.      <u>The Debtors' Management and Board of Managers</u>

15.      The following is, on Table A, an overview of the Debtors' key officers and management as of the Petition Date, each of whom serve in the indicated capacities, and on Table B, an overview of the Phoenix Parent's Boards of Managers, including each members' position on the Board and position within each other Debtor:

**TABLE A**

| Name | Position |
| --- | --- |
| William H. Littlefield | President and CEO |
| Peter A. Furman | Chief Restructuring Officer |
| Douglas A. Mills | Vice President Finance |
| Jill A. Boerger | Vice President Sales |
| Eytan Eliahoo | Director Sales – Canada |
| Barry L. Kay | Vice President Sales Non-Food and Export |
| Christopher McGovern | Vice President Sales Grocery (Northeast) |
| Raymond H. Stack | Director Sales Non-Food |
| Douglas V. Wilson | Sales Director Grocery and Rit Dye |
| William H. Schmitt | Vice President Research & Development |
| Lori S. Sullivan | Senior Director Customer Operations |
| Teresa K. Clark | Controller |
| Alan P. Radovic | Director Financial Planning & Analysis |
| Michael M. Johnson | Director Manufacturing Operations |
| Kathleen A. Dreyer | Senior Director Manufacturing Operations and Purchasing |
| James P. Corcoran | Vice President Human Resources & Administration |

**TABLE B**

| Name | Board Position |
| --- | --- |
| William H. Littlefield | Board of Managers Member, President, and Chief Executive Officer, Phoenix Brands Canada ULC. President and Chief Executive Officer, Phoenix Brands LLC, and Phoenix North LLC. Chief Executive Officer and Board of Managers Member, Phoenix Brands Parent LLC. |
| Pieter Kodde | Board of Managers Member and Vice President, Phoenix Brands Canada ULC. Vice President, Phoenix Brands LLC, and Phoenix North LLC. Chairman of the Board of Managers, Vice President, and Secretary, |

6

| Name | Board Position |
| --- | --- |
|  | Phoenix Brands Parent LLC. |
| Michael J. Lyons | Board of Managers Member and President, Phoenix Brands Parent LLC. |
| Philip Kim | Board of Managers Member and Vice President, Phoenix Brands Parent LLC. |
| Gary R. Fraser | Board of Managers Member, Phoenix Brands Parent LLC. |
| Hunter Gustman | Board of Managers Member, Phoenix Brands Parent LLC. |

D.    The Debtors' Operations

16.    The Debtors source, manufacture, and distribute laundry detergent and fabric care products throughout North America with limited distribution through export distributors in foreign markets. The Debtors sell wholesale to regional and national retailers located within the United States and Canada. Apart from a small amount of direct to consumer business by Rit, which Rit outsources to a third party to administer, the Debtors have no direct to consumer retail program; therefore a substantial amount of their revenue is derived from sales to retail outlets.

17.    The Debtors outsource the manufacture of all laundry detergent and fabric care products. The only product line produced by the Debtors in house is Rit. The Debtors also rely on vendors for bottle production, filling, and logistics. This raises significant challenges as the Debtors must, at all times, manage their vendors to ensure timely deliveries of sufficient product to meet customer needs. This requires careful and effective planning.

18.    The vast majority of the Debtors' operations are conducted through Phoenix Brands, which serves as the Debtors' operating company. The Debtors' operations in Canada are supported by Phoenix Brands Canada ULC, which holds inventory in its own name and has its own set of vendor relationships. The bulk of the Debtors' operations are in support of their sales initiatives. Phoenix's sales function is led by six sales leaders primarily supported by a leading brokerage agency that specializes in growing brands in the consumer packaged goods industry in

7

the U.S. and a third party broker network in Canada. The Debtors manage select key accounts in-house.

19.    The Debtors' core businesses can be separated into four units: (i) Rit Dye; (ii) Canadian laundry detergent brands; (iii) Final Touch fabric softener; and (iv) United States laundry detergent brands. The following are descriptions of the Debtors' business units:

(i)    <u>Rit Dye</u>

20.    Rit is the #1 selling dye in America and an iconic brand dating back to 1916. Rit products include powder and liquid dyes, including newly-released DyeMore, fabric treatments, and ProLine for commercial use. Rit core consumers use Rit to refresh clothing and fabric appearance. Rit also has a growing following among crafting enthusiasts and those engaging in do-it-yourself projects. Rit products also include the Sun Guard brand (Sun Guard is a wash-in powder that provides UV protection).

21.    In order to facilitate Rit's continued growth and brand awareness, the Debtors host "The Rit Studio®," a dedicated online platform launched in 2013 to connect with consumers and drive usage occasions. The Rit Studio has assisted the Debtors in increasing their overall consumer footprint through engaging consumers.

22.    The Debtors manufacture Rit and have 22 employees at a factory facility in Indianapolis, Indiana.

23.    Rit's assets include inventory, accounts receivable, the formulas, trademarks, intellectual property, and manufacturing operations (i.e., property, plant and, equipment). For the twelve months ending December 31, 2015, the Rit business generated approximately $11,532,000 in net revenues.

DOCS_DE:207335.1 70787/001

(ii)    <u>Canadian laundry detergents ("Canada Laundry")</u>

24.    Canada Laundry consists of laundry detergent marketed under the Arctic Power and ABC laundry brands. Arctic Power is a heavy-duty formula that has a loyal following among Canadian consumers, especially in Quebec. ABC is a value brand liquid detergent. The Debtors outsource the manufacturing of Canada Laundry products to various vendors located within the continental United States.

25.    Canada Laundry assets include accounts receivable, the formulas, trademarks, intellectual property, and inventory. For the twelve months ending December 31, 2015, the Canada Laundry business generated approximately $6,196,000 in net revenues.

(iii)    <u>Final Touch fabric softeners ("Final Touch")</u>

26.    Final Touch brand offers a variety of fabric softeners and scent boosters. Final Touch products are distributed within the United States, and enjoy considerable success in the northeast region of the country. Final Touch brands also include the recently introduced "Fresh Expressions" line of scent enhancing products. The Debtors outsource the manufacturing of their Final Touch products to various vendors within the continental United States.

27.    Final Touch assets include the formulas, trademarks, intellectual property, and inventory. For the twelve months ending December 31, 2015, Final Touch generated approximately $12,860,000 in net revenues.

(iv)    <u>United States Laundry Detergents ("US Laundry", and together with RIT, Canadian Laundry, and Final Touch, the "Brands")</u>

28.    US Laundry consist of four brands Ajax, Fab, Dynamo, and Fresh Start. Ajax is a nationally recognized brand associated with everyday cleaning. The Ajax trademark is used under license from the Colgate-Palmolive Company. Ajax shares the same brand as Colgate-Palmolive's Ajax dish and surface cleaner line, and enjoys a 65-year brand heritage under

9

"Stronger than Dirt" slogan (also used under license from the Colgate-Palmolive Company). Ajax has earned the Good Housekeeping Seal of Approval, reinforcing quality with consumers, and has an active consumer engagement through social media.

29.    Fab laundry detergent is positioned as Phoenix Brands' enhanced sensorial product line. The Debtors recently completed upgrades to Fab's packaging and formulas, including a longer lasting scent introduced in 2014. Fab shows strong sales in the South, Southeast, and Northeast regions of the United States.

30.    Dynamo is known as a tough, stain-fighting brand and has developed a strong following in the Northeast and Upper-Midwest parts of the United States. Dynamo's brand heritage dates back to 1972. Dynamo is supported by on-going innovation, building on the brand's reputation.

31.    US Laundry also includes the Fresh Start brand. Phoenix has devoted considerable resources to develop a full line of laundry products under the Fresh Start® brand, with potential to launch regionally or as a proprietary brand for a retail partner.

32.    US Laundry assets include, accounts receivable, formulas, trademarks, intellectual property, and inventory. For the twelve months ending December 31, 2015, US Laundry generated approximately $26,160,000 in net revenues.

E.    <u>Significant Prepetition Indebtedness</u>[4]

33.    The following is a summary of the Debtors' pre-petition indebtedness (all terms as defined below), with further description of each debt and the terms thereof provided below:

| Debt | Amount Outstanding |
|---|---|
| Senior Secured Credit Facility | $21,374,997.07 plus accrued interest and fees |
| Subordinated Unsecured Credit Facility | $40,323,765.00 plus accrued interest |

---

[4]  This summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

(i)    <u>Senior Credit Facility</u>

34.    On or around February 1, 2011, Phoenix Brands entered into that certain Senior Secured Credit Agreement (as amended from time to time, the "Senior Credit Agreement") by and between Phoenix Brands as borrower, Madison as Agent, and the lenders party who from time to time are a party to the Senior Credit Agreement (each a "Senior Lender").

35.    The financing provided under the Senior Credit Agreement was divided into two tranches: (i) the Term A loan with an initial commitment of $40,000,000 (the "Term A Loan") and (ii) a revolving loan with an initial commitment of $30,000,000 (the "Revolving Loan" and, together with the Term A Loan, the "Senior Facility"). The Senior Facility is secured by substantially all the Debtors' assets. Each of the Debtors has guaranteed the Senior Facility.

36.    The Senior Facility bears interest at the following fluctuating variable rates depending on certain factors: Base rate = Prime rate + 4.75% + 2% default interest; LIBOR rate = Libor (with a Libor floor of 1.5%) + 5.75% + 2% default interest. As of the Petition Date, is approximately $1,665,670.09 in accrued and unpaid interest and $663,646.28 in fees was outstanding under the Senior Facility.

37.    The Debtors were obligated to make quarterly repayments of principal on the Term A Loan starting in June 30, 2011, and ending on January 31, 2016 (the "Termination Date"). The Revolving Loan was to be repaid in full on the Termination Date. Prior to an Event of Default, payments of principal were to be distributed ratably to all of the Senior Lenders. After the occurrence and during the continuance of an Event of Default, the Agent was to apply the proceeds of the collateral first to interest and principal on the Revolving Loan before applying the proceeds to interest or principal on the Term A Loan.

DOCS_DE:207335.1 70787/001

38.     The Senior Facility matured on the Termination Date. As of the Petition Date, there was approximately $7,509,420 in principal, plus accrued interest, outstanding under the Term A Loan, and (ii) $12,815,577.07 in principal, plus accrued interest, outstanding under the Revolving Loan. Certain of the Senior Lenders have traded their debt, and the Agent now holds nearly 87% of the amounts outstanding under the Senior Facility. The remaining amount outstanding is held by Fifth Street Finance Corp. ("Fifth Street").

(ii)     Subordinated Credit Agreement

39.     On or around February 1, 2011, Phoenix Brands as borrower and Fifth Street as Lender (the "Subordinated Lender") entered into that certain Subordinated Credit Agreement (the "Subordinated Credit Agreement") with an initial principal amount of $20,000,000, that with subsequent accruals and modifications is, as of the Petition Date, approximately $40,323,765 plus accrued interest was outstanding under the Subordinated Credit Agreement (the "Subordinated Credit Facility").

40.     The Subordinated Credit Facility accrues interest at 13.875% per annum, provided that the Debtors, at their election could permit up to 3.875% of interest to accrue as PIK interest. Following an Event of Default, the interest rate would rise to 15.875%. As of the Petition Date, approximately $789,763.80 in accrued and unpaid interest was outstanding under the Subordinated Credit Facility.

41.     The Subordinated Credit Facility is unsecured.

(iii)     Intercreditor Agreements

42.     The relationship between the Senior Lenders and the Subordinated Lender is governed by that certain Subordination and Intercreditor Agreement dated as of February 1, 2011 (as amended, the "Intercreditor Agreement").

(iv)     Trade Debt

43. The Debtors outsource nearly all of their production. The Debtors purchase raw materials from multiple vendors located throughout the world. The Debtors then outsource production for all Canada Laundry and United States Laundry products. The Debtors fabricate Rit products in their facility.

44. As of the month end February 2016, the Debtors estimate that they have approximately 150 trade creditors who are owed approximately $11,986,000 in unsecured trade vendor debt.

## RECENT FINANCIAL PERFORMANCE AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER II CASES

A.    The Company's Recent Performance

45. Over the past three years, the Debtors' net sales have been steadily declining. While the Debtors have seen market share growth in their Canada Laundry and Rit brands, US Laundry has suffered as a result of changing industry dynamics driven by the introduction of "mono-dose" laundry products by Tide during the first quarter of 2012. Tide's introduction of this new form of laundry product was complemented by heavy promotional support from Procter & Gamble's Tide and Gain, and competing promotions from other large competitor brands such as Arm & Hammer and Purex. Procter & Gamble also launched a value segment line of liquid laundry products, further increasing price pressures and promotional activity in the laundry category.

46. While the Debtors were in the process of researching their own mono-dose laundry products, the Debtors' core United States Laundry brands could not compete with the promotional spend of its competitors. Additionally, the entire "value" sector of the United States consumer laundry market suffered declines, which further affected Phoenix's performance.

47.    The Debtors' business model also affects its financial performance. The Debtors outsource all manufacturing of US Laundry and Canada Laundry products. The Debtors are party to a number of long term supply agreements with key vendors involved in the manufacture of these products. These supply agreements were negotiated before the general downturn in the laundry detergent market and are based on the Debtors generating significantly more volume than the Debtors presently need to purchase. Moreover, in certain cases, the Debtors are subject to fees and other penalties for failing to meet minimum purchase requirements. As a result, the Debtors' costs have become prohibitive and unsustainable.

48.    Although the consumer market is showing signs of stabilization, and despite numerous initiatives and extensive work by management and the Debtors' advisors, the Company continued to underperform in 2015.

B.    The Company's Pre-Filing Turnaround and Restructuring Efforts

49.    Prior to the Termination Date, the Debtors implemented numerous initiatives in an attempt to increase profitability and generate proceeds sufficient to repay amounts owing under the Senior Credit Facility.

50.    Recognizing that the market for value based laundry products was beginning to stabilize, the Debtors implemented a cost-savings program designed to increase its profitability. The cost savings initiatives included (i) rationalizing and, where appropriate, reducing the number of unique SKU numbers of the Debtors' products that are sold to customers, and (ii) lowering the cost of producing its products through optimizing the cost of raw materials and mix.

51.    In addition to implementing cost-cutting initiatives, the Debtors also looked to reduce their debt exposure by the sale of one of their core brands. In furtherance of these efforts, the Debtors, assisted by Sawaya Segalas & Co., LLC, an investment banking boutique specializing in the sale of consumer products, marketed for sale its Niagara brand. On November

14

4, 2015, the Debtors completed a sale transaction whereby the Niagara brand was sold to a company owned primarily by Faultless Starch/ Bon Ami Company. Despite a robust sale and marketing effort the sales price achieved was significantly below the amount needed by the Debtors to reduce the debt load in a meaningful way.

52.    During the pendency of these efforts to improve the Debtors' operations, the Debtors, with the active assistance of independent financial advisors, also solicited potential strategic or financial transactions with a variety of parties, as well as possible financing or refinancing transactions. These efforts continued on a substantially continuous basis from the second half of 2015 through the Petition Date. Among the possible transactions pursued were investments and other financial transactions, joint ventures, mergers or sales of the Brands (or portions of them), and discussions with existing creditors relating to possible recapitalizations.

53.    These efforts intensified in October 2015, when the Debtors retained Peter A. Furman of Getzler Henrich & Associates LLC ("GH") as their Chief Restructuring Officer ("CRO") and GH as their financial advisor.[5] The Debtors also retained Houlihan Lokey Capital, Inc. ("HL"), as their investment banker, which, with the Debtors active support commenced a comprehensive marketing process that has resulted in the Debtors identifying potential purchasers for the Debtors' remaining brands.

54.    In addition to these efforts, in late 2015, LEF4 contributed a total of $1 million of new capital into the Debtors. Lincolnshire Management continued to provide management support services, but did not charge the Debtors for such services.

---

[5] Shortly before the Petition Date, Mr. Furman joined HunterPoint LLC. Postpetition, Mr. Furman will remain the Debtors' CRO, and the Debtors will seek retention of GH as their financial advisors.

C.      Events Leading to the Filing of the Chapter 11 Cases

55.     Despite the Company's multi-faceted prepetition efforts to improve operations, the Debtors were unable to become profitable. As a result, the Debtors' efforts moved from attempts to restructure their indebtedness and implement operational improvements to a sale of substantially all their assets to satisfy claims of creditors. The Debtors have located counterparties for the sales of their brands.

56.     Each potential transaction relies on the Debtors' ability to continue operations, in some fashion, in order to implement one or more transition services agreements, which requires vendors to continue supporting the Debtors in its efforts to complete these sales transactions.

57.     The Debtors' ability to source credit has been severely constrained. In order to pay vendors, the Company has been forced to make payments, in part, through borrowings under the Revolving Loan Agreement notwithstanding the Termination Date, which were permitted through a series of forbearance agreements. The Debtors presently have no access to the Revolving Loan, and therefore cannot compel additional borrowings to satisfy working capital needs. Moreover, given that substantially all the Debtors' assets are encumbered, the Debtors are unable to source additional secured loans from other sources.

58.     Based on all these factors, and the strong desire of the stalking horse buyers to purchase the brands under § 363 of the Bankruptcy Code, and in order to maximize transaction outcomes, the Debtors decided to seek chapter 11 protection. To prepare for that, the Debtors in recent weeks have engaged in extensive negotiations with their lenders and potential purchasers to develop a consensual path forward in these cases that will minimize costs and maximize value for the benefit of all stakeholders. The negotiations continued literally up to the eve of these chapter 11 filings and have resulted in:

(i)    An agreement with the Secured Lenders authorizing use of the Secured Lender's cash collateral in accordance with an agreed upon budget and access to a debtor in possession credit facility that is intended to provide sufficient liquidity to fund any shortfall in operational needs so that the Debtors can complete the pending going concern sale process and confirm a plan of liquidation; and

(ii)    Agreements with three prospective purchasers of the Debtors' Brands who are willing to act as stalking horses for United States Laundry and Final Touch, Canadian Laundry; and Rit in a section 363 asset sale process.

D.    Key Relief Related to Timeline and Objectives.

59.    In order to obtain necessary financing and complete the sales of their Brands, the Debtors are, among other requests, seeking the following relief, all of which is critical to implement agreements and a process designed to maximize value for the benefit of creditors: (a) approval of use of cash collateral and debtor in possession financing; (b) authorization of a customer program to continue ordinary course relationships with its customers; and (c) approval of a sale process for the Debtors' Brands, which includes stalking horse bids.

(i)    Debtor in Possession Financing

60.    As discussed above, the Debtors are seeking authority to enter into a debtor-in-possession credit agreement that will provide postpetition financing in a total amount of up to approximately $23 million in the form of (a) new money revolving loans in an amount not to exceed $2 million; and (b) a roll-up (to be sought only on a final basis) of the senior secured loans in an aggregate amount up to approximately $21,374,997 outstanding under the Senior Credit Agreement. Further, the facility will provide the Debtors with access to the use of certain cash collateral of the debtor in possession lenders.

61.     The Debtors have an immediate and critical need to obtain financing and use cash collateral for, among other things, working capital purposes and to pay expenses incurred in these Cases in accordance with a proposed budget approved by the Senior Lenders.  Without immediate access to the financing and use of cash collateral, the Debtors would be unable to meet payroll and otherwise operate their business, and the Debtors' ability to preserve and maximize the value of their assets and operations would be irreparably harmed.

62.     The use of cash collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs. The Debtors sought, but were unable to obtain, unsecured credit allowable as an administrative expense. The Debtors have also sought, but were unable to obtain, credit: (a) having priority over that of administrative expenses; (b) secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. The Debtors require both the additional financing provided by the debtor in possession credit facility and the continued use of cash collateral. Financing on a postpetition basis is not otherwise available and is not available on terms more favorable than the terms contained in the proposed financing facility.

(ii)     <u>Authorization to Continue Customer Programs</u>

63.     As part of the Debtors' ordinary course of operations, the Debtors offer certain discount programs to its customers. While the Debtors offer a number of diverse programs, the programs fall, generally, into two categories: (i) invoice price adjustments, and (ii) coupon programs.

64.     <u>Invoice Price Adjustments</u>. As is common in the industry, the Debtors routinely offer volume or other promotional discounts to its customers. These discounts take the form of credits offered to customers. In the ordinary course of business, where a customer qualifies for

18

an invoice price adjustment, the Debtors would simply offer a credit against amounts owed on the invoice.

65.    A portion of the invoice price adjustments occur within the same invoice period. As such, the Debtors' invoice will reflect those promotional credits to which the customer is entitled. However, certain of the Debtors' programs extend credits for purchases made in multiple months. As such, it is conceivable that the Debtors would need to honor a credit earned prepetition notwithstanding the Chapter 11 Filings.

66.    The Debtors have examined their books and records and have determined that the total amount of potential pre-petition credits that would be honored in the post-petition period is approximately $1,500,000 which consists of $740,000 for the North American Laundry business and $760,000 for the Canadian Laundry business.

67.    <u>Coupon Program</u>. In addition to providing credits to its wholesale customers, the Debtors also routinely offer manufacturers coupons directly to retailers and consumers. The Debtors' coupon program resulted in an annual net spend of $250,000 in 2015. The Debtors estimate that the coupon program spend in 2016 will be approximately $200,000.

68.    It is essential that the Debtors be permitted to continue these customer programs and to honor both credits customers earned during the pre-petition period and coupons issued during the pre-petition period. The Debtors have engaged in a robust sales and marketing process in order to locate buyers for the Brands. The value of these Brands necessarily includes the value of any customer relationships. In order for the Debtors to ensure that its customer base remains engaged and unaffected by the imposition of these Cases, it is critical that the Debtors be able to honor existing promotions – in addition, obtaining this relief is necessary to prevent any reduction in the purchase prices contained in the stalking horse asset purchase agreements.

DOCS_DE:207335.1 70787/001

Without the relief requested in the motion seeking authorization to continue customer programs, there is a real and substantial risk that the Debtors' relationships with its customers will be impaired, which would detrimentally affect the value offered by the proposed purchasers for the Brands.

(iii)    <u>Authority To Establish Bidding Procedures and Sell the Brands</u>

69.    The Debtors have determined that, in order to preserve and maximize value to the greatest extent possible, it is in best interests of their estates to conduct an expedited auction sale process for the Brands. In this regard, the Debtors have entered into three separate agreements (the "Stalking Horse Agreements"): (i) Detergent 2.0, LLC (the "US Laundry Purchaser"), an acquisition entity formed by AP Deauville, pursuant to which US Laundry Purchaser has agreed to act as a stalking horse bidder for the purchase of certain assets and assumption of certain liabilities related to United States Laundry and Final Touch (collectively, the "US Laundry Assets"); (ii) Lavo, Inc. (the "Canada Laundry Purchaser") pursuant to which the Canada Laundry Purchaser has agreed to act as stalking horse bidder for the purchase of certain assets and assumption of certain liabilities relating to Canada Laundry (the "Canada Laundry Assets"); and (iii) SS Robin Operating, LLC (the "Rit Purchaser" and together with the US Laundry Purchaser and the Canada Laundry Purchaser, the "Stalking Horse Purchasers")) pursuant to which the Rit Purchaser has agreed to act as stalking horse bidder for the purchase of certain assets and assumption of certain liabilities relating to Rit (the "Rit Assets"). These sales, if consummated, would provide for the sale of substantially all the Debtors' assets, excluding certain working capital and other assets which will be retained and monetized by the Debtors.

70.    The Debtors have filed contemporaneously herewith a motion seeking approval of (a) bidding and sale procedures; (b) the sale of the Brands; and (c) certain related relief. The

proposed bidding procedures are designed to permit the Debtors to pursue the going concern transactions to maximize the value of the Debtors' assets for the benefit of their estates.

71.     Prepetition Sale and Marketing Efforts. This proposed sale process is the culmination of an extensive marketing process. Starting in October 2015, the Debtors have been exploring a possible sale or other transaction with a variety of financial and strategic buyers. In October 2015, the Debtors retained HL to advise on potential strategic opportunities. The Debtors further retained the CRO to assist with operational and debt service issues arising during the marketing and sale of the Brands. The Debtors and HL developed a list of potentially interested parties and engaged in initial communications regarding a potential transaction. HL solicited involvement from more than 170 potential strategic and financial parties. These parties were invited to sign nondisclosure agreements so that they could receive access to a Confidential Information Memorandum ("CIM"). 75 parties executed NDAs and received a CIM. Subsequently, 36 parties who remained active accessed material in the Debtors' electronic data room. The Debtors and HL set a deadline of January 6, 2016, for parties to provide the Debtors with non-binding preliminary indications of interest. Of the 170 parties contacted, seven parties submitted indications of interest for all or some of the business. HL contacted each party to discuss the opportunity, while continuing to develop interest from potential additional parties.

72.     HL continued to pursue and evaluate potential transactions and, as discussed above, the Debtors entered into the Stalking Horse Agreements. During the course of these cases, HL will supervise the sale process, market the assets, contact all potential bidders, and generally be available to respond to information requests from potential buyers. The Debtors believe this coordinated and comprehensive sale process, spurred by the Stalking Horse Agreements, will produce the highest available bid and maximize value for the Debtors' stakeholders.

73.     _Proposed Timeline_. The Debtors are proposing an expedited sale process in order to comply with the terms of the Stalking Horse Agreements that seeks the entry of a sale order within 60 days. The Debtors believe this is a reasonable timeframe given the extensive and comprehensive prepetition marketing efforts undertaken prepetition. The Debtors are requesting that the Court hold a hearing on the Debtors' proposed bidding procedures motion within 14 days of the Petition Date. An expedited hearing on the proposed bidding procedures is necessary because, among other things, both the Stalking Horse Agreements and the DIP Credit Agreement require the Debtors to obtain entry of an order approving the proposed bidding procedures within 20 days of the Petition Date.

## FIRST DAY PLEADINGS

74.     Contemporaneously herewith, the Debtors have filed a number of First Day Pleadings. I believe that, among other things, the relief requested in the First Day Pleadings is necessary to enable the Debtors to operate with minimal disruption during the pendency of these Cases and to maintain value as a going concern, as well as support the efficient and economical administration of these Cases.

75.     It is my further belief that, with respect to those First Day Pleadings requesting authority to pay discrete prepetition claims or continue selected prepetition programs (e.g., those First Day Pleadings seeking relief related to the Debtors' obligations to their employees and customers), the relief requested is essential to the Debtors' operations and necessary to avoid immediate and irreparable harm to the Debtors, their estates, employees, creditors, and other parties-in-interest. Specifically, the success of these cases depends in large part on the continuing operation of the Debtors' business in as normal course as possible. In addition, each of the Stalking Horse Agreements require the Debtors to provide transition services after closing. Impairment of the Company's operations at the early stages of these cases would imperil—if not

preclude—the Debtors' ability to consummate the sale process with resulting irreparable damage

the value of the Debtors' estates.

76.    A description of the relief requested and the facts supporting each of the First Day

Pleadings is set forth below.

E.    Administrative Motions

> (i)    *Motion for an Order Directing the Joint Administration of the Debtors'*
> *Chapter 11 Cases (the "Joint Administration Motion")*

77.    As stated above, there are four entities that filed Chapter 11 Petitions on the

Petition Date. The Debtors estimate that, among the four Debtor entities, there are in excess of

200 creditors, employees, contract counter-parties, and other parties-in-interest in these Cases,

whose interests may not be limited to interests in any one particular Debtor. Many of the

motions, hearings, and orders that will be filed in the Cases will almost certainly affect most, if

not all, of the Debtors. I believe that the separate administration of the Debtors' cases will result

in substantial duplication of pleadings and prosecution of matters, which translates into

significant cost, inefficiency and, potentially, confusion among parties-in-interest.

78.    Additionally, as an operational matter, nearly all assets are held by, and all claims

are incurred by, Phoenix Brands. The only debtor other than Phoenix Brands that may have

additional assets and trade debt held in its own name is Phoenix Brands Canada ULC. It would,

therefore, be unnecessary and inefficient to have to seek independent relief in each of these

cases.

79.    Accordingly, in the Joint Administration Motion, the Debtors request entry of an

order authorizing the joint administration of their Cases for procedural purposes only.

Specifically, the Debtors request that the Court maintain one file and one docket for all of the

Cases under the case number and name of Phoenix Brands, such that the Cases be administered

under one consolidated caption and that an entry be made on the docket of each of the Debtors' Cases, other than Phoenix Brands, to indicate the joint administration of the Cases thereunder. The Debtors also seek authority to file the monthly operating reports required by the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees, issued by the Office of the United States Trustee on a consolidated basis.

80.     Given the foregoing, I believe that an order directing joint administration of the Cases will reduce fees and costs by avoiding duplicative filings and objections, and will allow the U.S. Trustee and all parties in interest to monitor the Cases with greater ease and efficiency, which will inure to the benefit of all interested parties, and will not harm the substantive rights of any party-in-interest.

    (ii)    *Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor* (the "Creditor Matrix Motion")

81.     As discussed below, the Debtors are not in a position to file their Schedules and Statements of Financial Affair as of the Petition Date and, I have been informed by legal counsel, that without further relief, they would be required to each file a list of creditors and their addresses.

82.     In the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to prepare a consolidated list of creditors in lieu of submitting any required mailing matrix, (b) authorizing the Debtors to file a consolidated list of the Debtors' 20 largest unsecured creditors (the "Top 20 Creditors List"), and (c) authorizing the Debtors to mail initial notices through their proposed claims and noticing agent Rust Consulting/Omni Bankruptcy (the "Claims and Noticing Agent"), (d) waiving the requirement that each Debtor file a list of creditors on the Petition Date, and (e) approving the form and manner of notifying creditors of commencement of the Debtors' Cases (the "Notice of Commencement").

83.     The Debtors have worked with the Claims and Noticing Agent to prepare a single, consolidated list of the Debtors' creditors in electronic format, which the Debtors are prepared to make available in electronic form to any party-in-interest who requests it. I believe that preparing the consolidated list of creditors in lieu of individual creditor matrices will permit the Claims and Noticing Agent to promptly provide notice to all applicable parties, maximize efficiency and accuracy, and reduce costs. In addition, converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

84.     The Debtors also propose that the Claims and Noticing Agent undertake all mailings directed by the Court, the U.S. Trustee, or as required by the Bankruptcy Code or the Bankruptcy Rules. I believe that using the Claims and Noticing Agent for this purpose will maximize efficiency in administering the Cases and will ease administrative burdens that otherwise fall upon the Court and the U.S. Trustee.

85.     Because the operating Debtors have creditors in common and, in many cases, operate as an integrated business enterprise, the Debtors request authority to file a single, consolidated list of their 20 largest general unsecured creditors instead of compiling separate creditor lists for each individual Debtor. I believe that preparing separate lists would consume an excessive amount of the Debtors' time and resources and would ultimately be fruitless given the majority of the Debtors do not have creditors other than the Secured Lenders and Subordinated Lenders.

*(iii)    Application of Debtors for an Order Authorizing the Appointment of Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent* (the "Claims and Noticing Agent Retention Application")

86.    In the Claims and Noticing Agent Retention Application, the Debtors seek entry of an order engaging and appointing Rust Consulting/Omni Bankruptcy ("Rust/Omni") as the Debtors' Claims and Noticing Agent in connection with, among other things, the distribution of notices and the administration, maintenance, processing, and docketing of proofs of claim filed in the Debtors' Cases.

87.    Prior to the Petition Date, counsel for the Debtors and the CRO solicited and reviewed engagement proposals from three claims and noticing agents. Thereafter, counsel for the Debtor and the CRO requested that these claims and noticing agents provide their best and most competitive bids. The proposals were then compared and the Rust/Omni bid was selected as the most competitive.

88.    The Debtors believe that, based on all engagement proposals obtained and reviewed, that Rust/Omni's rates are competitive and reasonable given Rust/Omni's quality of services and expertise. I have also been informed that Rust/Omni has the resources necessary to handle the volume of mailings and claims involved in these Cases.

89.    I understand that Rust/Omni has acted as the claims and noticing agent in numerous cases of comparable size, including cases in this Court. I have further been informed that Rust/Omni is not materially connected with any of the Debtors, their creditors, other parties in interest, the United States Trustee, or any person employed by the Office of the United States Trustee, and that to the best of Rust/Omni's Executive Managing Director Paul H. Deutch's knowledge, after due inquiry, Rust/Omni does not, by reason of any direct or indirect relationship to, connection with, or interest in any of the Debtors, hold or represent any interest

26

materially adverse to any of the Debtors, their estates, or any class of creditors or equity interest holders with respect to the matter upon which it is to be engaged.

90.     Accordingly, I believe that the employment of Rust/Omni as Claims and Noticing Agent is necessary, appropriate, and in the best interests of the Debtors' estates.

F.     Substantive Motions

  (i)     *Motion for an Order Authorizing the Debtors to Pay Prepetition Employee Wages, Benefits, and Related Items* ("Employee Wages Motion")

91.     The Debtors currently have approximately forty-three employees. The continued and uninterrupted support of the employees is essential to the Debtors' success. The employees perform a variety of critical functions in the Debtors' corporate headquarters, finance/operations office, sales offices, and manufacturing facilities. The skills and experience of the employees, their relationships with key parties to the Debtors' business, such as customers and vendors, and their knowledge of the Debtors' products, infrastructure, and business are essential to the preservation of the value of the Debtors' estates and, thus, the ability of the Debtors to maximize their value in connection with a going concern sale. Any interruptions in payment of prepetition employee-related obligations will impose hardship on the employees and is certain to jeopardize their continued performance during this critical time.

92.     To minimize the personal hardship that employees will suffer if prepetition employee related obligations are not paid when due, and to maintain the employees' morale during this critical time, it is important to pay and/or perform, as applicable, employee related obligations, including the following: (a) pay and honor owed wages, salaries, overtime pay, bonuses, sick pay, vacation pay, and other accrued compensation; (b) reimburse certain prepetition business expenses; (c) pay amounts deducted from employee paychecks on behalf of the employees for or with respect to, among other things, the Debtors' employee benefit

27

programs, loan repayments, and garnishments or amounts due third parties and on account of various federal, state, or local income, FICA, Medicare, state disability, workers' compensation, and other taxes to the appropriate parties; (d) pay prepetition contributions to, and benefits under, employee benefit plans, including certain severance payments, as described below; and (e) pay all costs and expenses incident to the foregoing payments and contributions, including payroll related taxes and related processing and administration costs.

93.    The Debtors are also seeking authority to continue their severance program as to certain employees on a postpetition basis, all as more fully described in the employee motion. The payment and continuation of certain severance benefits is critical to maintaining employee morale at a critical juncture for the Company.

> (ii)    *Motion for an Order Authorizing the Debtors to (i) Maintain Certain Customer Programs, and (ii) Honor or Pay Related Prepetition Obligations to Their Customers* ("Customer Programs Motion")

94.    As discussed above, in the ordinary course of their business, the Debtors maintain numerous programs for the benefit of their respective customers, including: invoice credit and coupon and rebate programs (collectively, the "Customer Programs"). Because the Debtors continue to provide goods and services to their customers on the Petition Date, the Debtors have certain outstanding prepetition obligations to their customers under the Customer Programs which otherwise would be honored in the ordinary course of the Debtors' business (collectively the "Customer Obligations").

95.    Given the critical nature of the Debtors' relationship with their customers and the importance of these relationships to the Debtors' business, the Debtors are seeking the entry of an order authorizing them to pay Customer Obligations, in the ordinary course of the Debtors' business. Subject to certain limitations set forth in the Customer Obligations motion, the Debtors seek to treat all Customer Obligations in the same manner and on the same terms and conditions

as such obligations were treated prior to the Petition Date, including paying, or providing credits or similar items, for prepetition Customer Obligations.

> (iii)    *Motion for Interim and Final Orders Establishing Adequate Assurance Procedures with Respect to Debtors' Utility Providers* (the "Utilities Motion")

96.    The Debtors utilize various utility services provided by numerous utility companies (collectively, the "Utility Companies"). Because the Utility Companies provide essential services to the Debtors and their retail operations, any interruption in utility services could prove devastating. In fact, the temporary or permanent discontinuation of utilities services at any of the Debtors' locations would irreparably disrupt business operations, and, as a result, fundamentally undermine the Debtors' restructuring efforts.

97.    The Debtors will propose procedures to protect the rights of Utility Companies, while protecting the Debtors' need for continuous and uninterrupted utility services. The Debtors further intend to pay all obligations owed to Utility Companies in a timely manner and I believe that the Debtors have, or will continue to have, sufficient funds from operations and their proposed postpetition financing to satisfy such obligations.

> (iv)    *Motion For an Order Authorizing the Debtors to Continue Their Insurance Programs and Pay Related Obligations* (the "Insurance Motion")

98.    In the ordinary course of their businesses, the Debtors maintain various insurance policies (collectively, as such policies may be supplemented, amended, extended, renewed or replaced, the "Insurance Policies"). Maintenance of the insurance coverage under the various Insurance Policies is essential to preserve the Debtors' businesses and, in some cases, is required by various laws, regulations, or contracts that govern the Debtors' businesses. Certain third parties may be owed amounts as of the Petition Date, and failing to pay such amounts could

result in loss of services, drastically impacting the Debtors' ability to renew coverage and process claims.

99.    The Debtors also maintain workers' compensation insurance in each of the states in which they do business, and provide employees with workers' compensation coverage for claims arising in any jurisdiction related to their employment (the "Workers' Compensation Program"). If the Workers' Compensation Program is not maintained, there is a risk that eligible claimants may not receive timely payments with respect to employment-related injuries, which could negatively affect employee morale and willingness of other employees to remain in the Debtors' employ.

100.    The payment of the Insurance Policies and the continuation of the Workers' Compensation Program are necessary to prevent the immediate and irreparable damage to the value of the Debtors' business, property and assets that could result from a loss of insurance.

> (v)    *Motion for an Order Authorizing Phoenix Brands LLC to Serve as Foreign Representative on Behalf of the Debtors' Estates* (the "Foreign Representative Motion")

101.    As stated herein, the Debtors conduct business in Canada, and one of the Debtors is a Canadian business entity. Debtor Phoenix Brands Canada ULC intends to commence an ancillary proceeding (the "Ancillary Proceeding") under Part IV of the Companies' Creditors Arrangement Act in the Ontario Court. Phoenix Brands, as the proposed foreign representative for the Debtors in the Ancillary Proceeding, intends to seek recognition of these cases and certain of the orders entered in these cases.

102.    In the Foreign Representative Motion, Phoenix seeks authorization, pursuant to section 1505 of the Bankruptcy Code, to act as the foreign representative of the Debtors, seek recognition by the Ontario Court of these cases, and of orders made by this Court, and request that the Ontario Court lend assistance to this Court.

*(vi)    Motion for an Order (I) Approving the Continued Use of the Debtors' Cash Management System and (II) Granting Related Relief (the "Cash Management Motion")*

103.    The Debtors utilize an integrated, centralized cash management system (the "Cash Management System") to collect, manage, invest, and disburse funds throughout the Company. The Cash Management System involves five bank accounts and has been in place for years. The Debtors maintain current and accurate accounting of all of the Debtors' transactions through the Cash Management System. The Cash Management System includes the necessary accounting controls to enable the Debtors, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.

104.    In connection with its Cash Management System and the Company's overall operations, the Company established various banking and business practices, including use of numerous business forms and investment practices. These practices are tailored to the Company's day-to-day and longer-term needs and, as such, were specifically designed and implemented for the Company.

105.    Finally, in the ordinary course of business, the Company conducts transactions among the Debtors. These transactions may give rise to, among other things, intercompany loans and intercompany services. The Company engages in these intercompany transactions for a variety of reasons, including efficiencies. The Debtors will account for all of their postpetition intercompany transactions and are asking that such transactions be afforded administrative priority status to ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another entity.

 *(vii)* *Motion of the Debtors for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (the "Interim Compensation Procedures Motion")

106. In this motion, the Debtors request the entry of an order authorizing and establishing procedures for the compensation and reimbursement of professionals whose retentions are approved by this Court pursuant to sections 327 or 1103 of the Bankruptcy Code (collectively, the "Professionals") on a monthly basis, on terms necessary to account for the reduced timeline for the Debtors to pursue a sale of substantially all of their assets. Such an order will (a) streamline the professional compensation process and enable the Court and all other parties to monitor more effectively the professional fees incurred in these chapter 11 cases, and (b) ensure that professionals have an opportunity to receive timely payment for their services in these cases.

 *(viii)* *Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing, but not directing, the Debtors Pay All or a Portion of the Prepetition Claims of Certain Critical Brokers and (B) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers* (the "Critical Brokers Motion")

107. The Debtors have designated certain brokers who, in the ordinary course of business, the Debtors utilize to arrange the majority of the Debtor's sales (the "Critical Brokers"). The Debtors need most, if not all, of these Critical Brokers to continue promoting and selling the Debtors' products while the Debtors continue operations in bankruptcy through the anticipated sale process. I believe any delay or disruption in these critical services would materially impact the Debtors ability to maintain their ongoing operations, and cause irreparable harm to the Debtors and their ability to reorganize.

108. These Critical Brokers are essential to the Debtors' ability to continue operations. In the exercise of the Debtors' business judgment, failure to satisfy the unsecured claims of these Critical Brokers, in whole or in part, would result in the Critical Brokers' refusal to perform

32

services for the Debtors, having an immediate and devastating affect on the Debtors' business operations. The Debtors therefore seek authority to pay the Critical Brokers, in the Debtors' sole discretion and business judgment, in the ordinary course of business and on terms consistent with prepetition operations. The Critical Brokers are current as of May 15, 2016. Accordingly, this request is to cover amounts incurred in the three day period between May 15, 2016 and the Petition Date. This amount is approximately $55,000.

109.    The Debtors believe that without this relief, Critical Brokers will have no incentive to continue to finance the Debtors on existing trade terms and may insist that the Debtors pay for their services on accelerated payment terms, cash in advance, or a cash on delivery basis. Any further expansion of these activities by other Critical Brokers would be detrimental to the Debtors, their estates, and their creditors.

> (ix)    *Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 107, 361, 362, 363, 364, and 507 and Rules 2002, 4001, 9014, and 9018 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (a) Obtain Post-Petition Financing, and (b) Use Cash Collateral; (II) Granting Liens and Super-Priority Claims; (III) Scheduling a Final Hearing; (IV) Approving Entry Into DIP Financing Support Agreement; and (V) Granting Related Relief* (the "DIP Motion")

110.    By the DIP Motion, the Debtors seek entry of interim and final orders: (i) authorizing the Debtors to obtain financing (the "DIP Financing") on a senior secured superpriority basis; (ii) authorizing use of cash collateral ("Cash Collateral"); (iii) granting priming liens, priority liens, and superpriority claims to the DIP Lenders (as defined in the motion); (iv) granting adequate protection; and (v) granting related relief.

111.    The Debtors negotiated with the Prepetition Secured Parties (as defined in the motion) to obtain DIP Financing to fund the Debtors' operations during these cases. Specifically, the Debtors have negotiated a post-petition financing facility to be provided by Madison Capital, as agent for the DIP Lenders, in the aggregate principal amount of up to approximately $23

million. As part of the agreement for the use of Cash Collateral, the Debtors will be deemed to remit any new money generated through operations to the DIP Lender in satisfaction of the pre-petition secured loans. The Debtors will then be deemed to have reborrowed those amounts under the DIP.

112.    The DIP Financing is essential to preserving and maximizing the value of the Debtors' estates. Since the Prepetition Secured Parties are no longer willing to extend loans to the Debtors, the Debtors' management has determined that, absent the funding provided by the DIP Financing, the Debtors would not have sufficient funds to continue to operate their businesses through the sale process. By providing the Debtors with immediate access to the capital that they need to, among other things, build their inventory and pay employees and vendors during these cases, the DIP Financing will enable the Debtors to continue to operate conducting orderly sales. The Debtors anticipate the DIP Financing will be satisfied from the sale proceeds.

113.    The DIP Financing and the other related agreements regarding the use of Cash Collateral and adequate protection (collectively, the "DIP Documents") are the result of extensive negotiations with the Prepetition Secured Lenders, conducted in good faith and at arm's length. The Debtors and their advisors believe that the proposed DIP Financing is the only viable option available to the Debtors, and the Debtors have therefore negotiated to obtain the DIP Financing on the best and most realistic terms available. The circumstances of these cases necessitate postpetition financing under section 364(c) and (d) of the Bankruptcy Code, and the DIP Financing offered by the Prepetition Secured Lenders reflects the sound exercise of the Debtors' business judgment.

114.    The Debtors sought, and were unable to obtain, sufficient and otherwise viable financing without granting priming liens pursuant to section 364(d) of the Bankruptcy Code. Given the Debtors' current debt level, and the expected value of the Debtors' assets, no counterparty was willing to offer financing on a junior lien bases, nor was any counterparty willing to engage in a priming fight. Additionally, the debtors sought alternative proposals for financing on an unsecured or priority basis, but no one would give the Debtors sufficient liquidity to fund these cases. Accordingly, the Debtors propose to obtain the DIP Financing by providing, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(l), (2), (3), and (d) of the Bankruptcy Code.

115.    The Debtors also require the use of Cash Collateral to ensure that they have the liquidity necessary to fund their ordinary course business operations and the administration of these cases while effectuating the sales. Without the use of Cash Collateral, the Debtors' liquidity needs would not be satisfied, jeopardizing the Debtors' ability to conduct an efficient and effective sale process in accordance with the timeline set forth in the DIP Documents. Thus, the use of Cash Collateral is imperative to the success of these cases.

116.    Approval of the DIP Motion will provide the debtors with immediate access to capital that is needed to preserve and maximize the value of the Debtors' estates. Absent this relief, the Debtors' operations would cease, resulting in irreparable harm to their businesses and their value.

117.    For these reasons, I believe the that the relief requested in the DIP Motion represents the best available option for the Debtors and will benefit all parties in interest.

DOCS_DE:207335.1 70787/001

(x)    *Debtors' Combined Motion for Entry of Orders: (i) Establishing Bidding and Sale Procedures; (ii) Approving the Sale of Assets; and (iii) Granting Related Relief* (the "Sale Motion")

118.    Concurrently herewith, the Debtors have filed the Sale Motion to establish bidding procedures for multiple auction sales of substantially all the Debtors' assets (the "Bid Procedures"), approve the Stalking Horse APAs and Bidding Protections (both as defined in the Sale Motion) (the "Bid Procedures Order"), and seek entry of an order approving the sales of substantially all their assets free and clear of liens, claims, encumbrances and other interests, and approving the assumption and assignment of certain executory contracts and unexpired leases (the "Sale Order").

119.    The Sale Motion seeks to effectuate a sale of substantially all the Debtors' assets on a going concern basis. The Debtors believe the proposed bid procedures and sales represent the best strategy to maximize value for the Debtors' various stakeholders.

120.    In addition, the Senior Lenders, as part of the DIP Financing (and the Stalking Horse Bidders), require that the Bid Procedures provide a streamlined and expeditious auction and sale process. The time periods set forth in the Bid Procedures are the product of extensive and arms' length negotiations between the Debtors and both the Stalking Horse Bidders and the Senior Lenders, and failure to adhere to such time periods could jeopardize the closing of the sale of the Brands.

121.    It is my opinion, after discussion with HL, that the continued presence of the Stalking Horse Bidders will set a floor for the value of the Debtors' assets and could attract other potential buyers to bid for them, thereby maximizing the realizable value of the assets for the benefit of the Debtors, the Debtors' estates, the Debtors' creditors, and all other parties-in-interest. If the Debtors are not able to adhere to such negotiated time periods, the Debtors are in danger of losing the only parties currently bound to consummate the sale of their assets.

36

122.    Accordingly, I believe that completing the bid process in an expeditious manner is critical to maintaining and maximizing the value of the Debtors' assets. As such, and because of the requirements of the Stalking Horse Bidder and the DIP Lenders, it is imperative that the Debtors undertake the process contemplated by the Bid Procedures with the goal of closing the highest and best sale transactions available to the Debtors' estates, as soon as possible.

> (xi)    *Motion to Shorten Notice and Request for Hearing with Respect to Debtors' Combined Motion for Entry of Orders: (i) establishing Bidding and Sale Procedures and Bid Protections, Including Break-Up Fee; and (ii) Granting Related Relief* (the "Motion to Shorten Time")

123.    As previously discussed, the Debtors' success in these Cases depends upon pursuing a sale of the Debtors' remaining business and assets on an expedited basis. Accordingly, the Debtors are requesting that the Court schedule expedited hearings on the Bid Procedures, including the Stalking Horse Agreement.

124.    These expedited hearings are required to comply with the terms of the Stalking Horse Agreement and the debtor in possession financing, and to enable the Debtors to efficiently and expeditiously sell their assets in order to maximize creditor recoveries.

37

## CONCLUSION

For all the reasons described herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

Dated: May 18, 2016

_____
William Littlefield